**E-FILED**
Wednesday, 25 March, 2009  10:25:32 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | |
|---|---|
| MARY V. HALSELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 08-3013 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Mary Halsell appeals from a final decision of the Social Security Administration (SSA) denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 423(d) and 1382c, and Disability Insurance Benefits (DIB)  under Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423, for the period from February 1, 2005 forward.  Halsell brings this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The parties have consented to a determination of this case by the United States Magistrate Judge, pursuant to 28 U.S.C. § 636.  Order (d/e 11), dated July 21, 2008.  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  Plaintiff's Motion for Summary Judgment (d/e 10); Defendant's Motion for

Summary Affirmance (d/e 13).  For the reasons set forth below, the Court determines that the SSA's decision is supported by the law and the evidence.  The SSA's Motion for Summary Affirmance is therefore allowed, and Halsell's Motion for Summary Judgment is denied.

STATEMENT OF FACTS

A.    Medical History

Halsell was born on April 2, 1954.  She is a high school graduate and has past relevant work experience as a food service manager, a certified nursing assistant (CNA), and a fast food worker.  In April 2004, Halsell underwent emergency surgery to drain abscesses related to cellulitis in her throat.  Administrative Record (d/e 9) (A.R.) at 137.[1]  According to Halsell, her health went "downhill" after this surgery.  A.R. at 427.  However, in a medical information form from the Bureau of Disability Determination Services, dated March 30, 2005, the doctor who treated Halsell's cellulitis noted that the condition had resolved, Halsell had been released from care, and to his knowledge Halsell had no impairment in work-related activities relating to the condition.  A.R. at 141.

---

[1]The Court will cite to the Administrative Record by the internal Bates Stamp page numbers.

Halsell asserts that she became disabled on February 1, 2005 due to left knee pain, right shoulder pain, throat problems, and lung problems. A.R. at 81.  However, other than the cellulitis discussed above, the record does not reflect that Halsell sought medical treatment for any of these conditions until September 2005.  On April 30, 2005, Halsell was examined by Dr. Raymond Leung at the request of the Illinois Disability Determination Division.  A.R. at 128.  The only medication that Halsell reported taking was Aleve.  In general, Dr. Leung indicated that Halsell developed mild shortness of breath and mild to moderate pain during the examination. A.R. at 129.  Dr. Leung noted that Halsell's gait was slow with a mild limp. She was able to walk fifty feet unassisted and toe walk, but was unable to heel walk.  Halsell was able to squat, but had difficulty getting up.  She exhibited no difficulty getting on and off of the examination table and her arm and grip strength were normal.  Dr. Leung noticed no muscle atrophy, but indicated that Halsell had decreased range of motion in her knees and shoulders.  The examination of Halsell's neck was "unremarkable," and she exhibited full range of motion in the neck.  A.R. at 131.

In June 2005, consulting physician Dr. Sandra Bilinsky prepared a Residual Functional Capacity Assessment for Halsell.  A.R. at 117.

Dr. Bilinsky reported that Halsell could frequently lift ten pounds and occasionally lift twenty pounds.  According to Dr. Bilinsky, Halsell could stand and/or walk for about six hours in an eight hour day and could sit for about six hours in an eight hour day.  With respect to postural limitations, Dr. Bilinsky noted that Halsell should never climb ladders, ropes, or scaffolds, but could occasionally climb ramps or stairs.  Dr. Bilinsky reported that Halsell could occasionally balance, stoop, kneel, crouch, and crawl. Dr. Bilinsky determined that Halsell was limited in reaching in both upper extremities, but that she exhibited no limitations in handling, fingering, or feeling.  Dr. Bilinsky reported that Halsell should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Bilinsky's assessment was reviewed and affirmed by consulting physician Dr. William Conroy on August 9, 2005.  A.R. at 126.

In September 2005, Halsell established care with Dr. Michael Kirkpatrick.  Dr. Kirkpatrick performed a number of diagnostic tests on Halsell, which revealed minimal abnormalities.  In an examination on September 28, 2005, Halsell exhibited discomfort on manipulation of her neck posteriorly, discomfort on manipulation of both knees with obvious

mild effusion and crepitus, discomfort on manipulation of both hands, and medial compartment tenderness.  A.R. at 239.  Dr. Kirkpatrick referred Halsell to Dr. Ronald Wheeler, an orthopedic surgeon, for input on her joint discomfort, especially the knee and neck pain.  Id.

In October 2005, Dr. Kirkpatrick placed Halsell on a trial of prescription pain reliever Ultram for her osteoarthritis and prescribed an Advair inhaler for dyspnea, or shortness of breath, on exertion.  A.R. at 241. On November 22, 2005, Halsell reported in a phone call that the Ultram was not strong enough and the pain in her shoulder was still intense.  A.R. at 243.  Dr. Kirkpatrick advised Halsell that she should use Tylenol and Aspercreme, an over-the-counter topical pain reliever, for excess shoulder pain.  Id.

Halsell saw Dr. Wheeler in late October 2005, complaining of back and neck injury, knee pain, and shoulder pain.  A.R. at 217.  Dr. Wheeler noted a decreased range of motion in Halsell's left shoulder.  His impressions were impingement syndrome in the left shoulder, probable degenerative joint disease, and possible rotator cuff tear.  A.R. at 219. Dr. Wheeler ordered an MRI scan of Halsell's left shoulder.  Halsell returned to Dr. Wheeler in November 2005.  A.R. at 220.  The MRI revealed rotator

cuff tear and degenerative arthritis in the left shoulder.  Dr. Wheeler advised Halsell she should consider shoulder surgery and return to see him in four weeks.

Halsell returned to Dr. Wheeler on November 29, 2005.  A.R. at 221. She reported that she had not done any therapy since her last visit because it was too painful.  She reported constant discomfort and desired to proceed with surgery.  Dr. Wheeler recommended arthroscopy of the left shoulder, subacromial decompression, joint arthroplasty and possible rotator cuff repair.  Therapy was discontinued, and arrangements were made for surgery.

Dr. Wheeler performed the surgery on December 16, 2005.  A.R. at 225.  In a follow-up appointment on December 22, 2005, Dr. Wheeler noted that Halsell's wound was healing well and there was no evidence of infection.  A.R. at 226.  During a follow-up appointment on December 29, 2005, Dr. Wheeler directed Halsell to begin external rotation exercises and physical therapy.  A.R. at 227.  On January 18, 2006, Halsell returned to Dr. Wheeler, complaining of consistent pain in the left shoulder.  A.R. at 228.  Halsell reported taking both Darvocet and Vicodin, which she had been advised not to do.  Dr. Wheeler discontinued the Vicodin, but allowed

continued Darvocet for pain.  He noted a passive improvement in Halsell's range of motion, but noted that her arm was quite heavy and would require extensive physical therapy.  He directed Halsell to intensify her therapy.

By February 2006, Dr. Wheeler noted a significant increase in the passive range of motion in the left shoulder.  A.R. at 229.  Halsell reported continued use of occasional pain medications that did not seem to help. Dr. Wheeler directed an increase in Halsell's physical therapy program. In a note dated February 27, 2006, Dr. Wheeler indicated that Halsell was unable to work due to left shoulder surgery.  A.R. at 230.  Dr. Wheeler's examination notes from February 28, 2006, indicate that Halsell had been working harder in physical therapy.  A.R. at 231.  Dr. Wheeler noted near full passive rotational movement in the left shoulder and increased strength in all parameters.  He directed continuation of Halsell's strengthening and range of motion physical therapy.

In February and March 2006, Halsell sought treatment for lower abdominal pain and diarrhea.  Dr. Kirkpatrick arranged a consultation with Dr. William Birsic, who ordered a colonoscopy.  A.R. at 362.  The colonoscopy results revealed a "basically normal" colon; however, biopsies revealed features suggestive of microscopic/lymphocytic colitis, a type of

bowel inflammation.  A.R. at 363, 365.  Halsell was placed on an anti-inflammatory medication, Dipentum, which improved her symptoms.
A.R. at 255.

On March 20, 2006, Halsell returned to Dr. Wheeler, complaining of persistent pain in the left shoulder.  A.R. at 232.  Dr. Wheeler noted restricted range of motion, but improved strength in all parameters.  He directed Halsell to continue with physical therapy and to consider a cortisone injection for pain.  Halsell returned on March 30, 2006, complaining of continued discomfort.  A.R. at 233.  Dr. Wheeler performed a steroid injection at the site of the greatest tenderness.  By April 19, 2006, Halsell exhibited increased strength and range of motion with trace diffuse tenderness.  A.R. at 234.  Dr. Wheeler directed Halsell to continue physical therapy and to increase home exercises.

On May 18, 2006, Halsell returned to Dr. Wheeler, reporting that she had fallen into a door frame the night before, injuring her shoulder.  A.R. at 235.  Dr. Wheeler noted acceptable range of motion and improved strength. He discontinued Halsell's physical therapy and directed her to continue with a home exercise program.  Halsell was discharged from physical therapy on June 29, 2006 after thirty-nine visits.  A.R. at 264.  The Discharge Summary

prepared by her physical therapist indicated muscle strength of 4/5 and
100% range of motion improvement in all categories.  Also on June 29,
2006, Dr. Wheeler noted that Halsell was continuing to work on her range of
motion and strength, but that she denied any other problems with the left
shoulder.  A.R. at 236.  Dr. Wheeler advised Halsell to continue her
exercise program.  In August 2006, Halsell reported discomfort in the
shoulder, but denied any great pain.  A.R. at 237.  Dr. Wheeler noted that
no pain was elicited on examination.  Dr. Wheeler directed Halsell to
continue her exercise program and to recheck with him as needed.

Halsell returned to Dr. Kirkpatrick in August 2006, complaining of
rectal bleeding and considerable lower back pain.  A.R. at 259.  By
September 2006, Halsell reported that Dipentum had improved her bowel
symptoms considerably and resolved her diarrhea.  A.R. at 261.
Dr. Kirkpatrick ordered an MRI of Halsell's lower spine which was performed
on August 30, 2006.  A.R. at 215.  The MRI revealed diffuse spondylosis, or
osteoarthritis, of the lumbar spine.  In September 2006, Dr. Kirkpatrick
certified Halsell for a handicapped parking permit based on her
osteoarthritic back pain.  A.R. at 378.  In doing so, Dr. Kirkpatrick certified

that Halsell was severely limited in her ability to walk due to an arthritic condition and that this disability was permanent.

In May 2007, Halsell complained to Dr. Kirkpatrick of diffuse joint pain especially in her knees, lower back, and feet.  A.R. at 372.  Halsell reported no benefit from Aleve.  Dr. Kirkpatrick directed Halsell to discontinue Aleve and placed her on a trial of Nabumetone and Elavil. Dr. Kirkpatrick scheduled lab work.  Testing revealed that Halsell's blood glucose was elevated, and she was diagnosed with type II diabetes mellitus.  Dr. Kirkpatrick prescribed Metformin to help control Halsell's glucose levels.

In June 2007, Halsell completed interrogatories in connection with her claim for benefits.  A.R. at 97.  When asked "Why do you feel that you cannot currently work?," Halsell replied "I am in so much pain that it affects my ability to work."  A.R. at 98.  When asked "What is it about your mental or physical problems that prevents you from working?," Halsell replied "The pain."  Id.  Halsell averred that she was in constant pain, at a level of ten, in her head, shoulder, wrists, knees, ankles, stomach, lungs, lower and upper back.  A.R. at 99.  Halsell reported taking Catripalenel, Nabumetone, and Metformin as prescribed by her doctor.  According to Halsell, the

medication "just makes it tolerable."   A.R. at 100.  Halsell reported taking

Atripalene to help her sleep.  According to Halsell, this medication was

effective, but she did not sleep through the night or wake feeling rested.  Id.

Halsell reported that she could walk half a block and stand for ten minutes

before she would have to sit or lie down.  Halsell reported that she could sit

for thirty minutes before having to stand or lie down.  According to Halsell,

in an eight hour day she could stand for an hour or so, walk half a block,

and sit for an hour and a half.  Halsell reported that she could not even pick

up a newspaper, that she did not drive, that her daughter did her grocery

shopping for her, and that her kids performed all of her household chores.

According to Halsell, she could attend religious or family events "[a]s long

as there is sitting or some where [she] can lie down."  A.R. at 103.  Halsell

stated that she could perform all necessary personal hygiene activities,

except that she needed help getting out of the bath.  Halsell noted that she

had to cut her hair so that she could handle it herself.  Halsell indicated that

she read the newspaper and sometimes magazines, but that she could not

do so for more than fifteen minutes due to pain.

B.    Administrative Hearing

On March 8, 2005, Halsell applied for SSI and DIB.  She alleged disability beginning February 1, 2005.  Her claims were denied initially and on reconsideration on August 11, 2005.  On September 7, 2005, Halsell filed a timely request for an administrative hearing.  The Administrative Law Judge (ALJ), Jan E. Dutton, presided over a video hearing on June 18, 2007.  Halsell appeared with counsel.  The ALJ heard testimony from Halsell and Steven Kuhn, a vocational expert.

Halsell testified as follows.  At the time of the hearing, she had been married to her current husband for thirteen years.  Her husband has been receiving disability benefits since 2004 due to back problems and low blood sugar.  A.R. at 424.  Halsell quit her job in January 2005.  At the time she stopped working, Halsell was a general manager at a Dairy Queen in Omaha, Texas, a job she had held for a year and a half.  According to Halsell, she quit her job because she could not do the work that was expected of her "because of health reasons."  A.R. at 425.  Halsell testified that the lifting, the hours, and the standing associated with the job were difficult for her.  Prior to the Dairy Queen job, Halsell had been a manager at What-a-Burger in Texas for approximately ten years.  Prior to the

What-a-Burger job, Halsell had worked as a CNA in Jacksonville, Illinois. Halsell also previously worked at Burger King as a cook, with some cashiering.  Halsell testified that she had worked in basically all capacities of a fast food restaurant.

Halsell testified that she moved to Illinois in 2005 so she could be around her family, including a granddaughter who was about to be born at that time.  A.R. at 427.  Halsell did not look for work after moving to Illinois. When the ALJ asked whether Halsell quit work so she could be closer to the grandchild, Halsell replied that she quit work because of health reasons.  Id.  According to Halsell, after the surgery for cellulitis in 2004, she was out of work for about four weeks and "from then on [she] just went downhill."  Id.  Halsell, however, did not discuss the reasons she wanted to quit work with her doctor or ask his opinion on the issue prior to quitting her job.  A.R. at 427-28.  Halsell testified that she just decided that she could not handle it anymore.  A.R. at 428.

After relocating to Illinois, Halsell established care with Dr. Kirkpatrick.  At the time of the hearing, Halsell was taking amitriptyline once a day before bedtime to help with pain and put her to sleep.  A.R. at 428-29.  Even with the amitriptyline, Halsell testified that she woke up three

or four times a night.  A.R. at 440.  She was also taking metformin for
diabetes and used an ambutheline inhaler to combat wheezing that
accompanied strenuous activity.  Although her doctor told her that she
could also take Tylenol for pain, Halsell did not take it.  A.R. at 429.  Halsell
explained that the Tylenol, "seems to keep [her] awake."  Id.  Halsell
testified that, during the day, "most of the time" she experienced pain at a
level eight on a scale of zero to ten.  Id.  This pain was in her lower back,
neck, shoulders, and knees.

Halsell, who is right handed, testified that her left shoulder surgery
was successful, "[t]o a point."  A.R. at 429.   Following the surgery, Halsell
did physical therapy for four or five months.  Halsell acknowledged that,
when she was discharged from the therapy, neither the doctor or the
physical therapist gave her any permanent restrictions.  A.R. at 430.
Halsell, however, testified that, at the time of the hearing, she was unable
to lift with her left shoulder, scratch her back, or raise her arm above her
head.   Halsell testified that, after she had her shoulder fixed, she did not
talk to her orthopedist, Dr. Wheeler, about any of the problems she
identified in the hearing.  A.R. at 439.

Halsell had a "scope" procedure on her right shoulder in 2000.
A.R. at 433.  Halsell testified that, at the time of the hearing, she could not
lift her right arm above her head or put it behind her back.  When asked
about her arm strength, Halsell testified that it was hard for her to pick up a
book or newspaper to read, noting that she had to lay these items in front
of her.  According to Halsell, the heaviest thing that she was capable of
lifting was a gallon of water.

At the time of the hearing, Halsell was 5' 4" tall and weighted 240
pounds.  She stated that this weight was down from her weight in January
2005, a fact which Halsell attributed to her diabetes.  Halsell stated that she
spent most of her time watching television or doing puzzle books.  A.R. at
430.  According to Halsell, she could concentrate on the puzzle books for
approximately fifteen minutes before the words all seemed to go together.
A.R. at 438.  She testified that she lived in a mobile home with her
husband.  While Halsell had driven in the past, she did not currently drive
because she could not turn her head to look back and worried that she
might back into something.

Halsell testified that she had trouble shampooing her hair, but could
do it in the shower with pain.  A.R. at 433-34.  She stated that she could

get into the bathtub, but needed help to get out.  A.R. at 440.  When asked

whether she had any difficulty getting dressed, Halsell replied that she

could not put on her shoes, explaining that her husband had to put them on

for her.  Id.  According to Halsell, she experienced tingling in her arms and

legs, like "when it wakes up from being asleep," for eight or nine hours

when she is up.  A.R. at 434.  Halsell testified that she had been suffering

from this tingling for two years.  Halsell stated that she also suffered from

"[v]ery sharp, painful" headaches that lasted from three seconds up to two

minutes.  Id.  Halsell testified that she has these headaches three or four

times an hour.  When a headache occurs, Halsell becomes dizzy, sees lots

of spots, and usually has to get off of her feet.

Halsell testified that she could not turn her neck to look behind her.

According to Halsell, her doctor attributes the neck pain and stiffness to

arthritis.  Halsell further stated that she experienced constant pain in her

stomach due to colitis, which also resulted in frequent diarrhea and

cramping.  A.R. at 436.  Halsell testified that her lower back pain extended

down into her legs, to the knees.  Halsell reported a sharp pain in the front

of her right leg and a constant, but tolerable, dull pain in her left leg.

Halsell reported difficulties with her knees that prevented her from squatting or putting her legs up on a footstool.

Vocational expert Kuhn also testified.  The ALJ first asked Kuhn to consider an individual who could lift or carry twenty pounds; frequently lift or carry ten pounds; stand or walk for six hours in an eight-hour day; occasionally climb, balance, stoop, kneel, crouch, and crawl; not work on ladders, ropes, scaffolds; not perform overhead reaching or work with dangerous machinery or at heights; and not work with concentrated exposure to fumes, odors, dust, and gases.  Kuhn testified that such an individual could perform Halsell's past relevant work as a food service manager, a job which included approximately 10,000 positions in the applicable region and 190,000 positions nationally.  A.R. at 443-44.  Kuhn classified the food service manager position as a skilled job.  A.R. at 445. Kuhn further testified that such an individual could perform work as an unskilled fast food worker at the light physical demand level.  Kuhn opined that, given the restrictions identified in the hypothetical, Halsell could perform seventy-five to eighty percent of positions identified at the light, unskilled level, including production worker, packaging machine operator, food preparation, and fast food worker.

The ALJ then asked Kuhn to consider an individual with the following additional restrictions: standing just two hours in an eight-hour day and lifting and carrying only ten pounds.  A.R. at 445.  Kuhn opined that, given her fast food manager background, Halsell would  have transferable skills of record-keeping and working effectively with others and the public.  With these transferrable skills, Kuhn testified that Halsell could work as an account clerk, order clerk, or cashier.  A.R. at 446.

When asked to consider Halsell's testimony as completely credible, Kuhn testified that she would be unable to return to her past work or to perform any other work on a regular and consistent basis.  A.R. at 447.  Kuhn pointed out that Halsell's reported lack of stamina, inability to lift more than three pounds, headaches, and pain level would interfere with her ability to perform work available in the national economy.

Applicable regulations classify fast food management as light work.  Upon questioning by Halsell's attorney regarding the position classification, Kuhn testified that, typically, fast food managers have the ability to direct the work flow to meet their needs.  A.R. at 448.  Halsell testified that she was required to unload boxes and five gallon oil barrels off of trucks twice a week in each of her fast food management positions.  A.R. at 449.  Halsell

stated that the boxes weighed from twenty to fifty pounds.  Kuhn testified

that this work as described would constitute medium to heavy work.

Crediting Halsell's description, Kuhn agreed that Halsell would not be able

to return to past relevant work.  A.R. at 450.

C.    The ALJ's Decision

On August 14, 2007, the ALJ issued her decision, finding that Halsell

was not disabled from February 1, 2005 through the date of the decision.

The ALJ reached her conclusion based on the five-step sequential

evaluation process established by the SSA, which requires a determination

of whether the claimant (1) is engaging in "substantial gainful activity"; (2)

has a medically determinable impairment that is "severe"; (3) has

impairments that meet or medically equal the criteria of an impairment

listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"); (4) has

the "residual functional capacity" to perform past relevant work; and (5) is

able to do any other work considering the claimant's residual functional

capacity, age, education, and work experience.  20 C.F.R. §§ 404.1520,

416.920(a)(4).  For the first four steps, the claimant bears the burden of

proof and of providing evidence.  On the last step, however, the

burden shifts to the SSA to prove that other work that the claimant can

perform exists in sufficient numbers in the national economy.  20 C.F.R.
§§ 404.1520(g), 416.912(g).

The ALJ concluded that Halsell met her burden at steps one and two
of the analysis, but that she did not have an impairment or combination of
impairments that met or medically equaled one of the listed impairments in
Appendix 1 (step three).  The ALJ then considered whether Halsell retained
the residual functional capacity to perform her past relevant work (step
four).  She concluded that Halsell retained the residual functional capacity
to perform light work with the following exceptions: Halsell could only
occasionally climb, balance, stoop, kneel, crouch, or crawl; and she must
avoid overhead reaching with both shoulders, fumes, and hazardous
conditions.  In making this determination, the ALJ noted that Halsell's
impairments could reasonably be expected to produce the alleged
symptoms.  However, the ALJ determined that Halsell's statements
concerning the intensity, persistence, and limiting effects of the symptoms
were not entirely credible.  A.R. at 17.  Specifically, the ALJ noted that the
record was devoid of medical opinion that Halsell was disabled,
recognizing that the fact Halsell received a handicapped placard did not
evidence an inability to perform sedentary work.  Additionally, the ALJ

noted that, despite Hasell's allegations of severe pain, she had not been prescribed any significant regimen of pain medication and she continued to engage in a range of daily activities.  Id.  The ALJ further noted that, although Halsell had access to orthopedist Dr. Wheeler, she never followed up with him with respect to her legs and lumbar complaints.

Based on this residual functional capacity determination, the ALJ found, at step four, that Halsell was able to perform her past relevant work as a food service manager.  In making this finding, the ALJ relied on Kuhn's testimony from the video hearing.  The ALJ then went on to consider whether Halsell, an individual closely approaching advanced age with at least a high school education and the ability to communicate in English, had acquired transferable skills from past relevant work.  Again relying on Kuhn's testimony, the ALJ determined that Halsell's skills would transfer to several hundred thousand semiskilled sedentary jobs on a national level such as order clerk and cashier.  The ALJ further determined that Halsell's ability to perform light work with express exceptions left 75 to 80% of all unskilled light work available to her.  The ALJ concluded that Hasell was "not disabled" and, therefore, not eligible to receive SSI or DIB.

D.    The Appeals Council

Halsell filed a timely request for review to the Appeals Council.

Halsell submitted three additional exhibits, which were made part of the

record.  A.R. at 7.  The Council, however, found no reason to review the

ALJ's decision and, on November 30, 2007, denied Halsell's request for

review.   A.R. at 4-6.  Thus, the decision of the ALJ became the final

agency decision.  Halsell then filed her timely Complaint (d/e 2).

ANALYSIS

A claimant is entitled to benefits if he or she establishes an inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to last

for a continuous period of not less than twelve months.  This Court reviews

the ALJ's decision to determine whether it is supported by substantial

evidence, and the Court may not re-weigh evidence, resolve conflicts in the

record, decide questions of credibility or substitute its own judgment for that

of the ALJ.  Young v. Barnhart, 362 F.3d 995, 1001 (7th Cir. 2004).

Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate" to support the decision.  Richardson v. Perales,

402 U.S. 389, 401 (1971).  The Court must accept the ALJ's findings if they

are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). The ALJ must, however, at least minimally articulate her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).   The Court must be able to "track" the analysis to determine whether the ALJ considered all of the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

Halsell seeks reversal of the Commissioner's decision, asserting that the ALJ erred in (1) evaluating Halsell's subjective complaints and making a credibility finding that was based on assumptions that lacked evidentiary support; (2) finding that Halsell could perform her past relevant work as a food service manager; and (3) failing to pose a hypothetical to the vocational expert that took into account all of Halsell's limitations.  As set forth below, Halsell's arguments are unavailing.

A.  The ALJ's Credibility Determination

Halsell contends that the ALJ erred as a matter of law in evaluating her subjective complaints by failing to apply the factors set forth at 20 C.F.R. § 404.1529 and SSR 96-7p and by making a credibility finding based on assumptions that lacked evidentiary support.  The ALJ found that

Halsell's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  A.R. at 17.  The ALJ determined, however, that Halsell's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. Id.  Under 20 C.F.R. § 404.1529(c)(3), the ALJ is directed to consider the following factors relevant to symptoms such as pain:  daily activities; the location, duration, frequency, and intensity of pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment, other than medication, received for relief of pain; any measures used to relieve pain; and other factors concerning functional limitations and restrictions due to pain. Additionally, Social Security Ruling 96-7p requires an ALJ to provide specific reasons for making a credibility determination.

        As Halsell's concedes, the ALJ cited specific reasons to support her determination that Halsell's statements concerning her pain were not entirely credible.  Halsell contends that the identified reasons lack support in the record.  The Court disagrees.  The ALJ noted that Halsell had access to an orthopedic physician for her shoulder, but failed to follow up with him with regards to her legs and lumbar complaints.  This statement is

supported both by the medical records and by Halsell's own admission that, after her shoulder was fixed, she did not talk to Dr. Wheeler about any other problems.  A.R. at 217-238, 439.  Dr. Kirkpatrick initially referred Halsell to Dr. Wheeler "in regards to numerous joint discomforts especially into the knees and neck."  A.R. at 239.  The fact that Dr. Wheeler did not provide treatment for complaints other than the shoulder is a properly considered under 20 C.F.R. § 404.1529(c)(3)(v).

Halsell further asserts that the ALJ misstated the evidence in noting that "she lived in Texas until January 2005 when she quit her job and moved to Illinois to be near her grandchildren."  A.R. at 17.  As the Court has previously noted, Halsell testified that she moved to Illinois in 2005 so she could be around her family, including a granddaughter who was about to be born.  A.R. at 427.  When the ALJ asked whether Halsell quit work so she could be closer to the grandchild, Halsell replied that she quit work because of health reasons.  Id.  The ALJ's statement does not misstate this testimony, but rather recognizes that Halsell moved to Illinois to be near family shortly after quitting her job.  The move is another factor that the ALJ could properly consider in assessing Halsell's symptoms.  See 20 C.F.R. § 404.1529(c)(3)(vii).

Halsell also asserts that the ALJ improperly discredited the fact that

Dr. Kirkpatrick issued her a handicapped parking placard as evidence of

her disability.  The ALJ noted that Halsell "does have a handicapped sticker

but this is not for the purpose of Social Security disability determinations

nor does it evidence any inability to perform sedentary work.  She has not

had back surgery, only shoulder surgery, so it is not clear why she

requested a handicapped sticker."  A.R. at 17.  The Court notes that the

State of Illinois definition of disability set out on the handicapped parking

application is distinct from the standard employed by the SAA in

determining whether an individual is entitled to benefits.  See A.R. at 378.

Dr. Kirkpatrick certified that Halsell was disabled for purposes of obtaining

the handicapped placard because she was severely limited in her ability to

walk due to an arthritic, neurological, or orthopedic condition.  Id.  This

does not equate to an opinion that Halsell is disabled for purposes of the

Social Security Act.  Thus, the ALJ was correct in noting that the fact that

Halsell had a handicapped sticker was not dispositive on the question of

disability for Social Security benefit purposes.  Similarly, the ALJ was

correct in noting that Dr. Kirkpatrick's certification that Halsell was severely

limited in her ability to walk was not inconsistent with an ability to perform

sedentary work, which requires only occasional walking and standing.  See 20 C.F.R. § 404.1567.  In her answers to interrogatories, submitted nearly a year after the handicapped placard was granted, Halsell stated that she could walk half a block and stand for ten minutes before she would have to sit or lie down.  Furthermore, the fact that Halsell has not had back surgery is a relevant factor to consider under 20 C.F.R. § 404.1529(c)(3)(v).

Halsell further contends that the statement that "she continues to engage in a range of daily activities" lacks evidentiary support.  However, there is evidence in the record that Halsell could attend religious or family events "[a]s long as there is sitting or some where [she] can lie down." A.R. at 103.  Halsell also stated in her interrogatories that she could perform all necessary personal hygiene activities, except that she needed help getting out of the bath, although she testified at the hearing that she experienced pain while shampooing her hair.  Halsell indicated that she read the newspaper and sometimes magazines, watched television, and did puzzle books.  There is support for the determination that Halsell continued to engage in a range of daily activities.  This is not a case in which the ALJ determined that Halsell retained the functional capacity to perform work based solely on her daily activities.  Rather, the ALJ

appropriately considered Halsell's reported daily activities in assessing the credibility of Halsell's allegations of constant, severe pain.

Finally, Halsell asserts that the ALJ erred in concluding that her March 2006 colonoscopy was normal.  As Halsell correctly notes, biospies from the colonoscopy revealed features suggestive of miscroscopic/ lymphoctic colitis.  A.R. at 210, 365.   However, the postoperative diagnosis was "[g]rossly normal appearing colon" and no polyps were noted during the procedure.  A.R. at 208-09  The ALJ's characterization of the colonoscopy as "normal" is not lacking in evidentiary support.  Additionally, the ALJ's decision specifically noted Halsell's history of colitis and complaints of diarrhea.  A.R. at 15, 18.  There is no basis for reversal arising out of the ALJ's determination that Halsell's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible.

B.  Past Relevant Work – Step Four

Halsell asserts that the ALJ erred in concluding that she could perform her past relevant work as a food service manager.  According to Halsell, at A.R. 450, vocational expert Kuhn testified that Halsell's past relevant work would be medium to heavy work and that, with a limitation to

light work, Halsell would be unable to return to work at these levels.

Halsell's argument ignores the distinction between Halsell's past relevant

work as Halsell described it and her past relevant work as it is generally

performed in the national economy.  It is clear from the record that food

service manager is considered light work as it is generally performed in the

national economy.  During the hearing, Halsell's attorney recognized that

fast food services manager is classified as light work in the applicable

regulations.  A.R. at 448, 450.  The vocational expert testified consistent

with these regulations, noting that in his experience, fast food managers

were able to direct the work flow to meet their needs.  A.R. at 448.  The

vocational expert agreed that the fast food manager position as described

by Halsell constituted medium to heavy work and that she would be unable

to return to work at those levels.  A.R. at 450.  However, under Social

Security Ruling 82-61, "if the claimant cannot perform the excessive

functional demands and/or job duties actually required in the former job but

can perform the functional demands and job duties as generally required

by employers throughout the economy, the claimant should be found to be

'not disabled.'"  Halsell fails to show that the ALJ erred in concluding that

the food service manager position as generally performed constituted light work.

   C.  ALJ's Hypothetical to Vocational Expert

   Halsell contends that the ALJ erroneously failed to pose a hypothetical to the vocational expert that took into account all of Halsell's limitations.  Specifically, Halsell asserts that the ALJ erred in failing to include limitations concerning her inability to walk more than 200 feet and limitations arising out of her diarrhea resulting from colitis.  Under Seventh Circuit precedent,  "[h]ypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record."  Steele v. Barnhart, 290 F.3d 936, 942 (7th Cir. 2002).  There is no medical evidence in the record to support a finding that Halsell was unable to walk more than 200 feet.  The application for the handicapped parking placard itself contains only a certification that Halsell was severely limited in her ability to walk due to an arthritic, neurological, or orthopedic condition.  A.R. at 378.  The ALJ considered and discounted on credibility grounds Halsell's testimony regarding limitations on her ability to walk more than half a block.  Similarly, there is no medical evidence to support any functional limitation arising out of Halsell's colitis-caused diarrhea.  In fact,

the record reveals that medication improved her symptoms of abdominal pain and diarrhea.  A.R. at 255.  There is no basis for reversal arising out of the hypothetical question posed by the ALJ.

Halsell briefly asserts that the conclusion that she could perform sedentary work is flawed because she would certainly miss more than two days of work a month due to her medical problems.  Again, there is no medical evidence in the record to support this limitation, and as set forth above, the ALJ's decision to not fully credit Halsell's testimony is supported by the record.  There is no basis for reversal on this issue as well.

<u>CONCLUSION</u>

THEREFORE, as set forth above, Halsell's claims of error fail.  The ALJ's decision that Halsell was not disabled is supported by the law and by substantial evidence.  The Commissioner of Social Security's Motion for Summary Affirmance (d/e 13) is ALLOWED.  Plaintiff Mary Halsell's Motion for Summary Judgment (d/e 10) is DENIED.  The decision of the Commissioner of Social Security is AFFIRMED.  All pending motions are denied as moot.  THIS CASE IS CLOSED.

ENTER:    March 25, 2009.

*s/ Byron G. Cudmore*
_____
BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE